IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDRICK CAPPS<br><br>        *Plaintiff.*<br><br>v.<br><br>MONDELEZ GLOBAL LLC<br><br>        *Defendant.* | CIVIL ACTION<br>NO. 14-04331 |

**PAPPERT, J.**                                                                                           November 24, 2015

## **MEMORANDUM**

      Mondelez Global LLC ("Mondelez" or "Defendant") fired Fredrick Capps ("Capps" or "Plaintiff") believing that he misused leave taken pursuant to the Family and Medical Leave Act ("FMLA"). In early 2014, Mondelez learned that on February 14, 2013, a day on which Capps took FMLA leave, he went to a local bar, became highly intoxicated and was arrested and charged for driving under the influence on his way home. Capps also took FMLA leave the following day after spending several hours in jail the night before. Capps filed this lawsuit after he was terminated, claiming that Mondelez interfered with his FMLA benefits, retaliated against him for taking FMLA leave, and violated his rights under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA").

      Before the Court are the parties' cross-motions for summary judgment. Based on the undisputed material facts, the Court finds that: (1) Mondelez did not interfere with Capps's exercise of his rights under the FMLA because it did not deny Capps any benefits to which he was entitled under the statute; (2) Mondelez did not retaliate against Capps for taking FMLA leave because it based its decision to terminate Capps on an honest suspicion that he misused that leave; and (3) Mondelez did not violate the ADA because Capps did not request an

1

accommodation under that law.  Accordingly, and as explained below, Capps's motion for summary judgment is denied, Mondelez's motion for summary judgment is granted and the case is dismissed.

## I.

Mondelez is one of the world's largest snack companies, whose brands include Oreo, Chips Ahoy!, Toblerone, and Trident.[1]  Capps began his employment with Mondelez's predecessor, Nabisco, in 1989.  (Def.'s Stmt. of Facts ("Def's SMF") ¶ 13.)  He worked on-and-off at the company as a mixing technician until his termination in March 2014.  (*Id.* ¶¶ 15–16.)  That position involves loading ingredients into and operating the mixing machine that makes dough.  (Def's SMF ¶ 14.)  Throughout Capps's tenure at the company, Mondelez maintained a clear policy regarding the use of FMLA leave: an employee may use intermittent FMLA leave when it is a "medical necessity" and must provide notice of the leave "as soon as practicable." (*Id.* ¶ 4, Ex. 1.)  Mondelez's policy, as set forth in its "Philadelphia Bakery Employee Guidelines," ("Employee Guidelines") also provided that "[a]s with all communications with the Company, the submission of false information to the Company regarding the need for FMLA leave, or the fraudulent use of FMLA leave, may result in discipline, up to and including termination."  (Def's SMF, Ex. 1.)  In addition, as set forth in a separate section entitled "Dishonest Acts on the Part of Employees," Mondelez stated that it "will not tolerate dishonesty on the part of its employees . . . .  Any employee found guilty of a dishonest act would be subject to dismissal."  (*Id.*)

In 2002, Capps was diagnosed with Avascular Necrosis, a degenerative bone disease. (Pl.'s Stmt. of Facts ("Pl's SMF") ¶ 16.)  As a result of this disease, Capps had both of his hips

---

[1]  http://www.mondelezinternational.com/~/media/MondelezCorporate/Uploads/downloads/mondelez_intl_fact_sheet.pdf.

2

replaced in 2004.  (*Id.* ¶ 18.)  He was certified for FMLA leave following this procedure, and was continuously certified approximately every six months for intermittent FMLA leave for his condition until his termination in 2014.  (Def's SMF ¶ 22; Pl's SMF ¶ 23, Ex. I.)  In his 2013 FMLA recertification covering January 24, 2013 through July 23, 2013, Capps's physician, Dr. Aron Guttin, D.O., stated that Capps cannot perform his job functions and "requires full bedrest during exacerbations."  (*Id.*, Ex. 8.)  Dr. Guttin also noted that "this year [the episodes] have been more severe and more frequent than years prior" and that Capps periodically "experiences temporary periods of inflammation that are debilitating and require anti-inflammatory medication and rest."  (*Id.*)  Mondelez's third-party FMLA administrator, WorkCare, approved Capps's recertification for FMLA leave covering the requested time period.  (Pl's SMF, Ex. O.)  The approval noted that Capps "may need to be off 1–2 times every month for a duration of up to 14 days per episode for incapacity and treatment appointments."  (*Id.*)

On Monday, February 11 and Tuesday, February 12, 2013, Capps took FMLA leave due to pain in his hips, and returned to work on February 13, 2013.  (*Id.* ¶ 32, Ex. Q.)  On February 14, 2014, Capps was scheduled to begin his mixing shift at 1 p.m.  (*Id.*, Ex. Q.)  Initially, he called Mondelez's phone system at 11:13 a.m. and the FMLA message line at 1:01 p.m., stating that he would be late to work because of leg pain. (Def's SMF ¶ 30; Pl's SMF ¶ 35.)  He subsequently called Mondelez's system at 2:15 p.m. and the FMLA message line at 2:12 p.m. stating that he would be taking a full FMLA day as the pain had not subsided.  (Def's SMF ¶ 31; Pl's SMF ¶ 36.)  At approximately 6 p.m. that evening, Capps drove to a local pub to meet friends.  (Def's SMF ¶ 34; Pl's SMF ¶ 40.)  While there, Capps ate dinner and drank three beers and three shots.  (Def's SMF ¶¶ 35–36; Pl's SMF ¶¶ 40–41.)  He spent approximately two and a half to three hours at the pub.  (Def's SMF ¶ 35.)  On his way home at approximately 9:10 p.m.,

Bensalem Township police officers stopped and arrested Capps for driving under the influence ("DUI") after they received a report of someone driving on the wrong side of the road. (Def's SMF ¶¶ 38–39, Exs. 14, 15.) After failing field sobriety tests, the police officers drove Capps to the hospital for a blood test, which revealed a blood alcohol concentration of 0.339%.[2] (Def's SMF ¶¶ 39–40, Exs. 14, 16.) Capps testified that he was released from jail at approximately 2:30 a.m on the morning of February 15, 2013. (Def's SMF ¶ 31; Pl's SMF ¶ 45.)

That day, Capps was scheduled to begin his shift at 1 p.m. (Def's SMF ¶ 42; Pl's SMF, Ex. Q.) He called Mondelez's phone system at 10:50 a.m. and the FMLA message line at 10:51 a.m., informing Defendant that he was taking an FMLA leave day due to continued leg pain. (Def's SMF ¶ 43; Pl's SMF ¶ 38.) On February 18, 2013, Capps returned to work as scheduled. (Def's SMF ¶ 44.) He did not report the DUI to anyone at Mondelez, and there is no record of anyone at Mondelez questioning Capps about his FMLA usage upon his return to work. (Def's SMF ¶ 44.) Capps was subsequently recertified for FMLA leave from July 31, 2013 through January 30, 2014. (Pl's SMF ¶ 31, Ex. P.)

In early 2014, Capps's Human Resources manager, William Oxenford, found in his company mailbox a newspaper article reporting Capps's DUI arrest and conviction from one year before. (Def's SMF ¶ 46; Pl's SMF ¶ 49.) Oxenford testified that he does not know who placed the article in his mailbox. (Pl's SMF ¶ 50.) He asked Barbara McAvoy, an employee in the Human Resources department, to investigate Capps's attendance record to determine if any of his FMLA leave days coincided with the date of his arrest. (Def's SMF ¶¶ 47–48; Pl's SMF ¶¶ 60–62.) When Oxenford and McAvoy reviewed Capps's criminal court docket, they noticed that his arrest date and court dates appeared to coincide with days on which Capps had taken

---

[2] A blood alcohol concentration of 0.339% is more than four times the legal limit in Pennsylvania. 75 Pa. C.S. 3802(2).

4

FMLA leave. (Def's SMF ¶ 48; Pl's SMF ¶ 62.) Specifically, the docket displayed Capps's arrest date, February 14, 2013, which Oxenford and McAvoy knew to be a day on which he took FMLA leave. (Def's SMF ¶ 49.) Other dates that appeared on the docket were June 4, 2013 and October 15, 2013, which Oxenford and McAvoy also knew to be dates on which Capps took FMLA leave. (Def's SMF ¶ 51, Ex. 20.) They did not, however, know if those dates were proceedings for which Capps was present in court. (*Id.* ¶¶ 51–54.)

At a February 26, 2014 meeting, Oxenford and McAvoy confronted Capps with this information. (Def's SMF ¶ 55; Pl's SMF ¶ 65.) At that meeting, Capps and his union representatives made multiple promises to provide documentation to support his FMLA leave on the days in question. (Def's SMF ¶ 57; Pl's SMF ¶ 72.) At that point, Capps was suspended pending further investigation. (Def's SMF ¶ 59.)

Capps subsequently submitted to Mondelez an undated letter from Dr. Guttin which stated that Capps was on FMLA leave February 14 and 15, 2013, in addition to stating that Capps had a court date on June 7, 2013 but "waived his right for that appearance." (Def's SMF ¶ 61, Ex. 24; Pl's SMF ¶ 75, Ex. Z.) On March 6, 2013, Mondelez received a nearly identical note from Dr. Guttin, dated February 27, 2013. (Def's SMF ¶¶ 63–64, Ex. 25; Pl's SMF ¶ 75, Ex. AA.) Suspicious of the two letters and the "doctor['s] comment on legal matters," Oxenford believed that Capps was "being dishonest with me." (Oxenford Dep. at 127:24–128:7.) "[H]e was dishonest in everything he provided me and he was providing me information piecemeal and not documentation I asked for or when I asked." (*Id.* at 134:6–9.)

In a letter dated March 21, 2014, Mondelez terminated Capps, effective February 26, 2014, for violations of the "Company Dishonest Act Policy." (Def's SMF, Ex. 29; Pl's SMF, Ex. B.) Oxenford and plant manager Rusty Moore made the decision to fire Capps. (Def's SMF ¶

5

74.) The termination letter stated: "You claimed to be out due to an FMLA related issues [sic] on multiple dates. The documentation you produced does not support your claim of FMLA related absences." (*Id.*) Both Oxenford and Moore testified that his termination was based on Capps's dishonesty and misuse of his FMLA leave on February 14 and 15, 2013: "the reason he didn't come to work is because he spent the night in jail and that's why he called out and then tagged it as FMLA." (Oxenford Dep. at 114:5–8.)

On March 27, 2014, Capps filed a grievance with Mondelez claiming he was unlawfully terminated. (Def's SMF ¶ 77, Ex. 24.) Capps attached to the grievance a letter from his criminal attorney, which stated the dates on which he attended court proceedings related to his DUI. (Def's SMF, Ex. 24.) In the following weeks, Capps submitted a May 31, 2013 letter from his criminal attorney addressed to Capps that summarized the then-upcoming criminal proceedings. (*Id.*, Ex. 26.) Oxenford retained an investigator, Joe Gill, to assist Mondelez in its continued review of Capps's usage of FMLA leave on February 14 and 15, 2013. (Def's SMF ¶ 70; Oxenford Dep. at 140:9–141:17.) Specifically, Oxenford asked Gill to investigate when Capps was released from jail on February 15, 2013 to determine if that coincided with the 2:30 a.m. release time that Capps previously provided. (Oxenford Dep. at 141:12–17; 142:13–17.) Gill subsequently determined that Capps was released from jail at 6 a.m. on February 15, 2015. (Def's SMF ¶ 71, Ex. 28.)

In an effort to reach a compromise with the union, Mondelez offered Capps reinstatement without back pay on April 28, 2014. Capps rejected the offer. (Def's SMF ¶¶ 78–79, Exs. 31–32.) Capps filed this lawsuit on July 18, 2014, and filed a second amended complaint on October 16, 2014. He alleged FMLA interference and discrimination as well as violations of the ADA and PHRA. (ECF No. 17.) Capps filed a motion for summary judgment on his FMLA

6

interference claim.  Mondelez filed a motion for summary judgment on all counts.  The Court heard oral argument on both motions on November 16, 2015.

## II.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).  "When confronted with cross-motions for summary judgment . . . the Court considers each motion separately" *Wernicki-Stevens v. Reliance Standard Life Ins. Co.*, 641 F. Supp. 2d 418, 422 (E.D. Pa. 2009), and the "governing standard does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (internal citations and quotation marks omitted).

### III.

FMLA claims are commonly brought under a theory of either interference or retaliation. *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). An FMLA interference claim arises under 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. An FMLA retaliation claim arises under 29 U.S.C. § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *See Callison*, 430 F.3d at 119.

### A.

To succeed on his FMLA interference claim, Capps must establish: (1) he was an eligible employee under the FMLA; (2) Mondelez was an employer subject to the FMLA's requirements; (3) Capps was entitled to FMLA leave; (4) Capps gave notice to the defendant of his intention to take FMLA leave; and (5) Capps was denied benefits to which he was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison*, 430 F.3d. at 119–20. "Because the FMLA is not about discrimination, a *McDonnell Douglas* burden-shifting analysis is not required." *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).

Capps satisfies the first four elements of an FMLA interference claim. First, Capps was an "eligible employee" for FMLA as defined by 29 U.S.C. § 2611. Capps worked at Mondelez for at least 12 months prior to taking leave, and he had worked at least 1,250 hours during the previous 12-month period. (Pl's SMF, Exs. A, B.) Second, Mondelez is an employer subject to

the FMLA as it engages in an industry affecting commerce and meets the statutory requirements for the number of individuals it employs.[3] (Pl's SMF, Ex. A.) Third, Capps was entitled to FMLA leave because he met the eligibility requirements and suffered from a serious health condition as defined by the FMLA.[4] 29 U.S.C. § 2611(2)(B)(11). Though there is a dispute about whether he needed to take FMLA leave on February 14 and 15, 2013, there is no dispute that Capps suffered from a degenerative bone disease and that WorkCare recertified Capps to take intermittent FMLA leave as needed during the time period in question. (*See* Pl's SMF, Ex. O.) Fourth, the parties do not dispute that Capps gave Mondelez notice of his intent to take the FMLA leave. Prior to the start of his shift on both February 14 and 15, 2013, Capps called the Mondelez phone system and the FMLA message line to inform the Defendant that he would be taking an FMLA day due to his severe leg pain. (Def's SMF ¶¶ 31, 43; Pl's SMF ¶¶ 36, 38.)

Capps's FMLA interference claim fails, however, because he cannot satisfy the fifth requirement—that he was denied a benefit to which he was entitled under the FMLA. "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007); *see Ross*, 755 F.3d at 192 ("Because Ross received all of the benefits to which he was entitled by taking leave and then being reinstated to the same position from which he left, and thus cannot satisfy the fifth prong of the interference analysis, he fails to make a prima facie showing of interference . . . .").

---

[3] An "employer" under the FMLA is defined as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" 29 U.S.C. § 2611.

[4] "A 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves– (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(2)(B)(11).

Capps relies on language from a Southern District of Ohio decision in arguing that the fifth element of an interference claim can instead be that the employer has "somehow used the leave against [the employee] and in an unlawful manner, as provided in either the statute or regulations."[5] *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004). The Third Circuit Court of Appeals has never adopted this variation on the fifth prong of the analysis, and has instead clearly stated that the denial of benefits is necessary to demonstrate an interference claim. *See Callison*, 430 F.3d at 119–20 ("An interference action is . . . only about whether the employer provided the employee with the entitlements guaranteed by the FMLA"). Capps's argument in this regard is similar to the argument advanced by the plaintiff in *Ross* and rejected by the Third Circuit. "Although Ross argues that his termination and the Addendum to his [Performance Improvement Plan]—actions which were taken *after* his FMLA leave—amount to a denial of FMLA benefits, we have made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." 755 F.3d at 192 (citing *Callison*, 430 F.3d at 119) (emphasis added). Any action taken by Mondelez in connection with Capps's February 14 and 15, 2013 FMLA leave did not occur until approximately one year *after* that leave had already been taken. Capps was given FMLA leave on February 14 and 15, 2013, and he returned to his same position with the same benefits when he came back to work on February 18, 2013. Any assertion that Mondelez improperly considered his FMLA leave as a factor in his termination is more properly brought as a retaliation claim, not an interference claim. *See Stephenson v. JLG Indus., Inc.*, No. 1:09-CV-1643, 2011 WL 1304625, at *5 (M.D.

---

[5] Capps also states in his motion that "It is a *per se* interference violation to consider prior FMLA-qualifying absenteeism in a decision to terminate an employee." (Mem. Mot. For Partial Summ. J. at 14–15, ECF No. 47.) However, many of the cases that Capps cites for this proposition, including *Viereck v. City of Gloucester*, 961 F. Supp. 703 (D.N.J. 1997) and *Edwards v. Harleysville Nat. Bank*, No. CIV.A.07-3987, 2008 WL 4589729, at *4 (E.D. Pa. Oct. 14, 2008) are factually distinguishable because they involve true interference claims—*e.g.*, the employee attempted to invoke his FMLA benefits but was terminated either before or during his leave. In contrast to Capps's sweeping statement about "*per se* interference," the Third Circuit has maintained that the employer's denial of benefits is essential to the analysis. *See Ross*, 755 F.3d at 192; *Callison*, 430 F.3d at 119.

Pa. Mar. 31, 2011) ("courts have consistently treated claims of interference as a result of termination as retaliation claims.")

**B.**

Capps's FMLA retaliation claim requires proof of Mondelez's retaliatory intent, and is therefore analyzed through the lens of employment discrimination law. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012). Accordingly, a claim based on circumstantial evidence, like Capps's FMLA retaliation claim here, is assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] *See Lichtenstein*, 691 F.3d at 302. Under this framework, Capps must establish a *prima facie* case of discrimination. *See Ross*, 755 F.3d at 193. If he succeeds, the burden then shifts to Mondelez to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See id.* If Mondelez is able to do so, the burden then shifts back to Capps to prove, by a preponderance of the evidence, that the articulated reason was pretext for the discrimination. *Id.* Here, when viewing the facts in a light most favorable to Capps, he is unable to sustain an FMLA retaliation claim: he cannot establish a *prima facie* case because there is no causal connection between a protected activity and his termination. Even if Capps could establish a *prima facie* case, he has not adduced any meaningful evidence that would allow a reasonable factfinder to find pretext. *See Ross*, 755 F.3d at 193.

To establish his *prima facie* case, Capps must show that (1) he invoked his right to FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse employment decision

---

[6] PHRA and ADA retaliation claims are also analyzed under the *McDonnell Douglas* framework. *See Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir.2005) ("retaliation claims under . . . the PHRA typically proceed under the *McDonnell Douglas* framework"); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.3 (3d Cir. 2004) ("The burden-shifting framework of *McDonnell Douglas Corp. v. Green* applies to ADA retaliation claims.") As a result, Mondelez's motion for summary judgment on the FMLA, ADA and PHRA retaliation claims can all be properly analyzed under the *McDonnell Douglas* framework.

was causally related to the leave. *Id.* He cannot demonstrate that the proper use of his FMLA leave—a protected activity—is causally connected to his termination. The Third Circuit has articulated two factors relevant to the analysis of establishing the causal link between the adverse employment decision and the FMLA leave: (1) a showing that the two events were close in time or (2) evidence of ongoing antagonism toward the employee. *See Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001). The question of timing focuses on the "temporal proximity between the protected activity and the termination." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (internal citations and quotation marks omitted). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (internal citations and quotation marks omitted).

Courts measure temporal proximity from the first date on which the litigant engaged in his protected activity. *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014). Here, the protected activity—FMLA days taken on February 14 and 15, 2013—occurred more than one year before the initial adverse employment action, Capps's suspension on February 26, 2014. (Def's SMF, Ex. 29; Pl's SMF, Ex. B.) Under the case law in this Circuit, a twelve-month gap between the protected activity and the termination is clearly not "unusually suggestive of a retaliatory motive."[7] *See, e.g., Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive when three weeks had elapsed between protected activity and adverse employment action); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two months is not unusually suggestive); *see also Abdul–Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) (noting that "six days is at the

---

[7] The gap between the adverse employment decision and the protected activity increases to thirteen months when counting from the date of Capps's termination on March 21, 2014.

long end of what has been held to be unusually suggestive."). Where the temporal proximity is not close enough to be unusually suggestive, the appropriate test is "timing plus other evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

In the absence of an unusually suggestive temporal proximity, Capps must show evidence that Mondelez "engaged in a pattern of antagonism in the intervening period." *Abramson*, 260 F.3d at 288. There is nothing in the record to support a finding of a pattern of antagonism towards Capps for taking FMLA leave. To the contrary, Capps returned to the same position with the same benefits on February 18, 2013. Nobody at Mondelez was aware of the DUI, and he continued to take intermittent FMLA leave without issue for the remainder of 2013. It was not until the newspaper clipping appeared in Oxenford's office mailbox in early 2014 that an issue arose surrounding Capps's FMLA usage.[8]

Without temporal proximity or a pattern of ongoing antagonism towards him, Capps is unable to establish his *prima facie* case. Even if he was, however, Mondelez has offered a legitimate non-discriminatory reason for his termination. Mondelez's burden is "relatively light" and its explanation for firing Capps must simply "permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32, F.3d 759, 763 (3d Cir. 1994). Here, as explained in the deposition testimony and documentary evidence—including the March 21, 2014 termination letter—Mondelez fired Capps for his misuse and dishonesty surrounding his FMLA leave in violation of the Employee Guidelines. Those guidelines explicitly state that any misuse of FMLA leave "may result in discipline, up to

---

[8] Capps notes that Oxenford did not investigate why the newspaper clipping was placed in his mailbox or who placed it there. (*See, e.g.,* Mem. Opp. Mot. For Summ. J. at 3–4, ECF No. 57.) How or why Oxenford came to know about the DUI arrest is not relevant to the question of whether he discriminated against Capps. As discussed *infra*, Mondelez is permitted to investigate an employee's use of FMLA leave. There are no requirements in the FMLA for how or why the employer initiates the investigation, or whether it needs a reason at all. *See Callison*, 430 F.3d at 121.

and including termination." (Def's SMF, Ex. 1.) This reason is sufficient to satisfy Mondelez's "relatively light" burden, and shift the burden back to Capps to prove that Mondelez's reason was merely a pretext. *See McDonnell Douglas*, 411 U.S. at 804.

In an effort to show pretext, Capps argues that: (1) he did not, as a matter of fact, misuse his FMLA leave on February 14 and 15, 2013; and (2) McAvoy and Oxenford's inconsistent deposition testimony regarding the scope of the investigation is sufficient to allow a jury to find Mondelez's business purpose unworthy of credence. (*See* Hr'g Tr. 68:11–70:8.) These two arguments are unavailing and fail as a matter of law.

To discredit Mondelez's reason and demonstrate pretext, Capps must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764–65. To satisfy the first prong, Capps "cannot simply show that the decision was wrong or mistaken, but must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the employer was not actually motivated by its proffered nondiscriminatory reason." *Parker*, 309 F. App'x at 556–57 (citing *Fuentes*, 32 F.3d at 765). In order to satisfy the second prong—that discrimination was more likely than not a motivating or determining cause of Mondelez's action—Capps "must point to evidence with sufficient probative force for a factfinder to make this conclusion;" *i.e.* that Mondelez has previously discriminated against him, that Mondelez has discriminated against other employees that also took FMLA leave, or that Mondelez has treated more favorably similarly situated persons that have not taken FMLA leave. *Parker*, 309 F.

App'x at 556–57 (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644–45 (3d Cir. 1998)). The record is devoid of any evidence from which reasonable jurors could find that Mondelez's stated reasons for terminating Capps's employment were a pretext for illegal discrimination.

Capps attempts to discredit Mondelez's reason for terminating him by denying, as a matter of fact, that he misused his FMLA leave. He argues that Mondelez is incorrect in concluding that he misused his FMLA leave since drinking in a bar is not inconsistent with having severe and debilitating leg pain. In *Parker*, the Third Circuit rejected a similar argument made by the plaintiff. "[T]he question is not whether [the employer's] decision was wrong or mistaken but whether [the employer] acted with discriminatory animus." 309 F. App'x at 557. "Any material issue that the evidence of his denial creates goes solely to whether the decision was wrong, not discriminatory." *Id.* Here, even if Capps was able to show how a more thorough investigation would have demonstrated that Mondelez's decision was wrong, no evidence exists that the decision was discriminatory. *See Parker*, 309 F. App'x at 558. It is not the role of this Court to "sit as a super-personnel department that reexamines an entity's business decisions. No matter how . . . mistaken the firm's managers, the laws barring discrimination do not interfere." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)).

Capps also points to perceived inconsistencies between the statements of Mondelez employees in an attempt to discredit Mondelez's proffered reason for terminating him and demonstrate that Capps's proper use of FMLA was a motivating factor in the decision. For this, Capps relies on McAvoy's testimony that Mondelez decided to investigate Capps because of his "frequent" use of FMLA. (Mem. Opp. Mot. For Summ. J. at 3–4, 18–20, ECF No. 57.) Capps

15

argues that McAvoy's testimony conflicts with other testimony that the sole reason for investigating Capps was to determine if he was working on February 14 or 15, 2013. (*Id.*) He argues that McAvoy's testimony "creates a material factual dispute about [Mondelez's] retaliatory motivations." (*Id.* at 20.) This is not a genuine issue of material fact; it is an attempt to inject an inconsistency into the record. The record evidence on this point is consistent, coherent and uncontradicted: Oxenford received a newspaper clipping in his mailbox about Capps's DUI arrest, conviction, and sentence. Learning of Capps's criminal troubles the year before prompted an investigation into Capps's attendance at work. At Oxenford's request, McAvoy investigated Capps's attendance by, in part, comparing Capps's FMLA usage to dates on his criminal docket. This raised a suspicion about whether Capps misused his FMLA leave, which led to his suspension and subsequent termination.

Whether Oxenford told McAvoy to investigate Capps's usage of FMLA on just the dates in February of 2013 or for the entire calendar year is not probative of the reasons for terminating Capps; if anything, it is solely probative of the reasons for investigating him. "Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave, . . . ." *Callison*, 430 F.3d at 121. There is no right in the FMLA for employees taking leave to be "left alone," and there is nothing in this Circuit's case law to suggest that an employer is prevented from investigating an employee if it suspects that he is misusing FMLA leave. *Id.* An employer in Mondelez's position has the right to investigate and terminate "an employee who abuses [his] leave," and the FMLA "does not shield an employee from dismissal merely because the alleged misconduct occurred while on leave." *Warwas v. City of Plainfield*, 489 F. App'x 585, 588 (3d Cir. 2012) (citing *Callison*, 430 F.3d at 121). "Consequently, an employer may defeat an FMLA claim if the discharge was based upon the employer's honest

belief that the plaintiff either misused or failed to use her medical leave for the intended purpose." *Id.* (internal citations and quotation marks omitted).

The record demonstrates that Mondelez's investigation was not sparked by Capps's use of FMLA leave; it was instigated by the newspaper clipping documenting Capps's arrest, legal proceedings, and subsequent jail sentence. There is nothing discriminatory or retaliatory about Mondelez investigating Capps after learning of the DUI. As long as Mondelez's investigation did not "conflict[ ] with nor diminish[ ] the protections guaranteed by the FMLA"—which it did not—it is not prohibited by the FMLA.[9] *Callison*, 430 F.3d at 121. The record evidence shows that the discovery of the DUI arrest and the subsequent investigation of Capps's FMLA usage gave the decisionmakers, Oxenford and Moore, an honest suspicion that Capps was misusing his FMLA leave.[10] Capps has not adduced any evidence that would allow a reasonable factfinder to discredit their course of action or find that a discriminatory animus was more likely than not a motivating factor in the company's decision. *See Parker*, 309 F. App'x at 560. Oxenford and Moore were allowed to terminate Capps based on that honest belief, free from interference by the FMLA and second-guessing by this Court. *See Garvin v. Progressive Cas. Ins. Co.*, No.5:08-CV-3758, 2010 WL 1948593, at *7 (E.D. Pa. May 10, 2010) ("The only inquiry is whether the decisionmaker [ ] honestly believed that Plaintiff had violated the company's policy at issue."); *Parker*, 309 F. App'x at 563 ("Regardless of Parker's denial that he actually misrepresented his

---

[9] Indeed, the body of law on FMLA interference and retaliation claims is replete with examples of employers using investigators to ensure that FMLA was being properly taken. *See, e.g., Callison*, 430 F.3d 117; *Crewl v. Port Auth. of Allegheny Cty.*, 837 F. Supp. 2d 495 (W.D. Pa. 2011); *Stephenson v. JLG Indus., Inc.*, No. 1:09-CV-1643, 2011 WL 1304625, at *4 (M.D. Pa. Mar. 31, 2011) ("courts have repeatedly upheld the termination of employees following similar investigations.") (collecting cases).

[10] Any contention that the investigation was imperfect or incomplete is of no consequence to the analysis. The employer "may have come to this conclusion [to terminate] rather impulsively; . . . . But nothing in the record suggests that he came to the conclusion because [the employee] was [ ] an 'aging woman' or because she had [ ] 'severe physical problems that were costing Navistar money.'" *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (finding no pretext for discrimination in violation of ADA, ADEA, ERISA, or FMLA). Similarly here, nothing in the evidence suggests that Oxenford and Moore came to the decision to terminate because Capps was using FMLA leave. Rather, they decided to terminate him because they believed he was *improperly* using FMLA leave—a decision they were permitted to make.

health condition, Verizon's honest suspicion that Parker misused his leave prevents it from being found liable for violating the FMLA[ ]").

**IV.**

Capps alleges that Mondelez failed to accommodate his disability as required under the ADA. That claim fails as a matter of law because Capps never made a request for an accommodation.

An employer is liable for failing to make reasonable accommodations if: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams*, 380 F.3d at 772). Capps argues that he "very clearly sought an accommodation from Defendant when he requested intermittent medical leave from work for his Avascular Necrosis and arthritis in his hips." (Mem. Opp. Mot. For Summ. J. at 25, ECF No. 57.) Our Court has held that "FMLA leave is not a reasonable accommodation" under the ADA. *Rutt v. City of Reading, Pa.*, No. CIV.A. 13-4559, 2014 WL 5390428, at *3 (E.D. Pa. Oct. 22, 2014). In *Rutt*, plaintiff similarly argued the same facts to support his FMLA and ADA claims. The Court held, however, that "a request for FMLA leave is not alternatively a request for a reasonable accommodation." *Id.* at *4. By requesting FMLA leave, the employee is telling his employer that he has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. On the other hand, an employee that requests a reasonable accommodation under the ADA is signaling that he "can perform the essential functions of the employment position." 42 U.S.C. § 12111. "Thus, an

employee who requests leave does not clearly communicate to her employer that she is disabled and desires an accommodation." *Rutt*, 2014 WL 5390428, at *4 n.11 (citing *Colwell*, 602 F.3d at 506).

Similarly here, Capps cannot proceed on an ADA accommodation claim under a theory that he requested an accommodation through his FMLA leave. The argument that he requested an accommodation, and thus signaled to Mondelez that he can perform the essential functions of his job, is belied by his own arguments on his FMLA claim. Under his FMLA theory of liability, Capps argues that he could not work at all. (*See* Mem. Opp. Mot. For Summ. J. at 12, ECF No. 57, ("His doctor verified that he was unable to stand/walk/sit for extended periods of time, (as he was required to work an hour shift), and therefore would require intermittent time off." (emphasis in original))). Capps cannot have it both ways. The record evidence demonstrates that because his pain left him unable to work during "flareups," he requested and received intermittent leave under the FMLA—not an accommodation under the ADA.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.